**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

| | | |
|---|---|---|
| EDWARD J. JABLONSKI, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:07-cv-00386 |
| | ) | |
| ST. PAUL FIRE AND MARINE | ) | |
| INSURANCE COMPANY, | ) | Senior Judge Thomas A. Wiseman, Jr. |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Plaintiff Edward Jablonski's Motion for New Trial (Doc. No. 361).  For the reasons set forth herein, the motion will be denied.

## I.      BACKGROUND AND STANDARD OF REVIEW

This action was tried before a jury over the course of eleven days from May 20, 2009 through June 4, 2009, on which date the jury was sent out to deliberate.  The jury returned a verdict in favor of plaintiff Jablonski on his counterclaim against St. Paul Fire & Marine Insurance Company for damages arising out of St. Paul's alleged violations of Fla. Stat. § 624.155, Florida's insurance "bad faith" statute, which also incorporates provisions of Fla. Stat. § 626.9541(1)(i), related to St. Paul's handling of a covered loss caused by Hurricane Charley to Jablonski's sixty-foot sailboat, the *Willpower*.  Specifically, the jury found that St. Paul had acted in bad faith in the settlement of Jablonski's claim in violation of Fla. Stat. § 625.155(1)(b), and had misrepresented pertinent facts or insurance policy provisions relating to the coverage at issue, and failed to explain the nature of requested information and the reasons why such information was necessary, in violation of Fla. Stat. § 626.9541(1)(i).  The jury awarded Jablonski $126,000 in damages but did not find that St. Paul committed the acts giving rise to the statutory violations with such frequency as to indicate a general business practice, which is a prerequisite under the statute for an award of punitive damages.

Jablonski now contends that this Court committed a number of evidentiary errors which, separately or in conjunction with each other, warrant a new trial.  Under Rule 59(a), "[a] new trial may be

granted to all or any of the parties and on all or part of the issues . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States[.]" *See, e.g.*, *George v. GTE Directories Corp.*, 195 F.R.D. 696, 701 (M.D. Fla. 2000) (new trial may be granted "for any reason recognized at common law, even where there is substantial evidence supporting the verdict").

The decision to alter or amend a judgment is committed to the sound discretion of the trial judge. *Lambert v. Fulton County*, 253 F.3d 588, 595 (11th Cir. 2001). Generally speaking, however, when ruling on a Rule 59 motion for new trial, the judge must determine if " 'the verdict is against the clear weight of the evidence . . . or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.' " *Lippardt v. Durango Steakhouse of Brandon*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quoting *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1556 (11th Cir. 1984)). "[T]o assure that the judge does not simply substitute his judgment for that of the jury, . . . we have noted that new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Id.* at 923 (quoting *Hewitt*). However, if the court "cannot say with fair assurance that the verdict was not substantially swayed," in light of "the number of errors, the closeness of the factual disputes, the prejudicial effect of the evidence, the instructions given, and whether counsel intentionally elicited the evidence and focused on it during the trial," a new trial should be granted. *Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 37 F.3d 1460, 1465 (11th Cir. 1994). *See also Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004) (noting that a new trial is warranted where errors caused substantial prejudice to the moving party, affected the party's substantial rights or resulted in substantial injustice).

## II.     ANALYSIS AND DISCUSSION

### A.     The Jury Instruction Pertaining to Punitive Damages Accorded with Florida Law.

Jablonski contends, first, that the Court "improperly instructed the jury" regarding the evidence necessary to support a punitive damages claim, leaving the jury with the "misimpression" that Jablonski was required to prove St. Paul's "general business practice" through the introduction of "other claims" evidence. (Doc. No. 361, at 4–5.)

The specific instruction to which Jablonski objects stated in pertinent part as follows:

>You may award punitive damages to Plaintiff Edward Jablonski if you find that Jablonski has proved by the greater weight of the evidence any one or all of his claims against St. Paul, and if you find that Jablonski has proved by clear and convincing evidence that:
>
>>1) the acts giving rise to the violation occurred with such frequency as to indicate a general business practice; and
>>
>>2) these acts were willful, wanton, and malicious, or in reckless disregard for the rights of the insured.
>
>. . . .
>
>In order to make a showing of a "general business practice," Edward Jablonski *must show more than St. Paul's acts within his own claim.*

(Doc. No. 344, Jury Instrs. at 12 (emphasis added).) In other words, contrary to Jablonski's assertion, the Court did not instruct the jury that Jablonski was required to introduce "other claims" evidence. Instead, the instruction simply required that the plaintiff, in order to prove a general business practice (as required by Fla. Stat. § 624.155(5)), present some evidence other than simply St. Paul's behavior "within his own claim."

Moreover, the instruction given comports with Florida law. The holdings from the few courts to consider the question indicate that evidence of something other than merely the insurance company's treatment of the plaintiff's claim is necessary in order to establish that the contested action constituted a general business practice. For instance, in *Shannon R. Ginn Construction Co. v. Reliance Insurance Co.*, 51 F. Supp. 2d 1347 (S.D. Fla. 1999), the Southern District of Florida, applying Florida law, required evidence outside of the insurance company's behavior in dealing with the plaintiff's claim, and granted summary judgment for the defendant because the evidence presented by the plaintiff, in the form of unsworn complaints from other jurisdictions, was inadmissible hearsay and therefore did not constitute proof that could be considered in the context of a summary judgment motion. Although the claim was in the context of Florida's unfair claim settlement practices act, Fla. Stat. § 626.9541(1)(i)], rather than the bad faith statute, § 624.155, the holding is instructive because the language used in both statutes is identical. As the court stated:

>To prevail [on a claim brought under Florida's unfair claim settlement practices act, Fla. Stat. § 626.9541(1)(i)], the plaintiff must establish that the insurer committed unfair acts "with such frequency as to indicate a general business practice." [Fla. Stat.] § 626.9541(1)(i)(3) . . . .

Florida law does not define the phrase "general business practice." Nonetheless, it seems clear that "general business practice" means *more than acting in the proscribed manner in the plaintiff's own claim. Cf. Howell-Demarest v. State Farm Mut. Auto. Ins. Co.*, 673 So. 2d 526, 529 (Fla. 4th DCA 1996) (evidence of instant claim and three other reported cases against insurer insufficient to establish a general business practice for purposes of punitive damages under section 624.155(4), Florida Statutes); *Ticor Title Ins. Co. v. University Creek, Inc.*, 767 F. Supp. 1127, 1138 (M.D. Fla. 1991) (plaintiff's claim itself was not sufficient to state a claim for unfair claim settlement practices under Section 626.9541(1)(i)). Thus, [plaintiff] *must present evidence of more than just its own claim* that would permit a reasonable jury to conclude that [the insurance company] engaged in unfair acts as a general business practice.

*Id.* at 1353–54 (emphasis added; footnote omitted ).

The two cases cited in *Shannon R. Ginn* are consistent with that case and with the instructions issued in this case. In *Howell-Demarest* the Fourth District Court of Appeals reversed the trial court's order granting summary judgment for the defendant on plaintiff's claim for punitive damages under Fla. Stat. § 624.155, finding the trial court had improperly concluded that the insurer's alleged actions were not sufficiently egregious to warrant punitive damages. Although it found that summary judgment on the punitive damages issue was not warranted, the appellate court nonetheless noted that, at trial, the plaintiff would have to present additional proof of a "general business practice" than that alleged in the complaint. Specifically, plaintiff referenced in her complaint three cited Florida cases in which the same defendant insurance company had been found to have engaged in the same behavior alleged in *Howell-Demarest*. The court noted: "To survive a motion for directed verdict, the insured would have to demonstrate that [the insurer] engaged in this practice far more frequently than that" in order to prove a "general business practice." *Howell-Demarest*, 673 So. 2d at 529.

Likewise in *Ticor Title Insurance Co. v. University Creek, Inc.*, 767 F. Supp. 1127, 1138 (M.D. Fla. 1991), the court, after a bench trial, found that the insured had not "present[ed] a justiciable controversy" under the unfair claims practices act because it failed to present proof that the insurance company had engaged in any unfair insurance settlement practice "with such frequency as to indicate a general business practice." Instead, the insured "merely contends that [the insurer] failed to act promptly *with regard to its own claim*."

In sum, the plaintiff's argument fails here because the instruction given to the jury did not require "other claims" evidence. It simply required that the plaintiff "show more than St. Paul's acts within his own claim." The instruction is consistent with Florida law as interpreted by Florida courts and federal courts,

and with the language of the bad-faith statute requiring that the plaintiff establish that the insurance company engaged in the alleged wrongful acts "with such frequency as to indicate a general business practice." Fla. Stat. § 624.155(5). The jury obviously found that Jablonski failed to make the requisite showing. Because the instruction was not in error, plaintiff's argument in that regard is unavailing.

        **B.**        **Plaintiff Was Not Denied the Ability to Present Evidence of Similar Claims.**

Plaintiff argues simultaneously that the Court erred in requiring evidence of "other claims" in its punitive damages instruction (which, as discussed above, it did not), and in precluding him from obtaining discovery of the type of evidence necessary to support a claim for punitive damages. Regardless of this internal inconsistency, it is not clear what type of evidence and documents the plaintiff sought but was prevented from discovering or otherwise unable to discover. Plaintiff in fact sought and obtained the production of civil remedy notices, complaints and other lawsuits against St. Paul from January 2000 to the present, along with the identity of all claims assigned to Matt Schmahl and/or TMS National from 1998 to the present, and evidence related to punitive damages awards arising out of first party bad-faith cases on Ocean Marine claims in Florida since 2004. Jablonski also obtained testimony from company witnesses identifying company procedures and practices and/or ratifying the practices and procedures of its agents; company documents identifying company practices and procedures; the testimony of expert witnesses regarding St. Paul's alleged business practices; and other types and categories of information pertaining to St. Paul's handling of similar claims. Plaintiff apparently could have, but chose not to, present evidence at trial of other complaints, civil remedy notices, judgments or awards against St. Paul. Plaintiff did introduce documentary evidence as well as testimony from company witnesses and expert witnesses concerning St. Paul's business practices. Plaintiff has not established what evidence he sought but was not permitted to discover. Regardless, Plaintiff cannot establish that he was substantially prejudiced by the allegedly improper evidentiary rulings.

        **C.**        **The Court Did Not Err in Excluding Evidence of the Strom Smith Lawsuit.**

At trial, Jablonski sought to introduce evidence of a lawsuit filed against St. Paul in Mississippi by a plaintiff named Strom Smith. The plaintiff here characterizes that lawsuit as "implicating Matt Schmahl on facts conspicuously similar to those alleged by Jablonski" in the present case. (Doc. No. 361, at 11.) At the bench conference conducted outside the jury's presence concerning the document at issue,

plaintiff's counsel stated that he sought to introduce the lawsuit to impeach Joe Grenzebach's testimony in some regard. (Doc. No. 336, Trial Tr. Day 9, at 5:6–19.) The Court excluded the proffered evidence on the basis that it was cumulative and that under Rule 403 of the Federal Rules of Evidence its probative value was substantially outweighed by the danger of unfair prejudice and confusion of the issues. (*Id.* at 6:24–7:14.) The lawsuit also consisted entirely of hearsay and was inadmissible on that basis. In any event, the Court properly exercised its discretion to exclude the proffered evidence, and the plaintiff was not substantially prejudiced by the ruling.

### D.     Greg Group's Videotaped Testimony Was Properly Excluded.

Jablonski seeks a new trial on the grounds that the Court erroneously excluded a portion of the proffered testimony of Gregory G. Group, a marine surveyor who purportedly had first-hand knowledge of Matt Schmahl's low-ball and aggressive estimating practices. Specifically, the plaintiff asserts that the Court erred in excluding Group's testimony to the effect that (1) he had personally dealt with and observed Schmahl on five occasions in relation to three claims over a five-year period and that on each occasion Schmahl had "overlooked significant damage, low-balled estimates, was confrontational, and "dug his heels in," just as he did with Jablonski's claim; and (2) Schmahl had a reputation in the marine-surveyor industry for precisely this type of conduct. (Doc. No. 361, at 12–13.) Jablonski argues the testimony was relevant because Florida's bad-faith statute requires evidence of violations of its provisions with such frequency as to indicate a "general business practice" before punitive damages may be awarded.

On May 28, the Court heard argument to exclude those portions of Group's testimony that would have gone to show "Mr. Schmahl's routine practice." (Doc. No. 355, Trial Tr. Day 6, at 3:20.) The defendant argued that Group had no personal, first-hand knowledge of any facts at issue in the case at bar, and his experience with Matt Schmahl was limited to having dealt with him in a few instances that took place outside of Florida while Schmahl was working for insurers other than St. Paul. The plaintiff argued, on the other hand, that Group would offer "habit testimony" permitted under Federal Rule of Evidence 406, and that the proffered testimony was not character evidence and therefore was not subject to exclusion under Rule 404(b). The Court then reviewed the designated testimony in camera before ruling that (1) Group's testimony in reference to a small number of interactions between him and Schmahl

was insufficient to establish a routine practice or habit under Rule 406; (2) the testimony was not permissible under Rule 404(b),[1] as it was an attempt to prove evidence of other acts of Schmahl "in order to show action in conformity therewith," Fed. R. Evid. 404(b); and, (3) alternatively, the probative value of the proffered testimony was substantially outweighed by the danger of unfair prejudice and therefore excludable under FRE 403. Although the plaintiff attempted to argue that the evidence was offered, not to show actions in conformity therewith, but to prove a plan or absence of mistake, the Court noted that the reason initially given for the testimony was to show habit testimony under Rule 406, which essentially permitted evidence of past actions in attempt to prove present actions in conformity therewith and that the plaintiff could not "have it both ways." (Doc. No. 355, Trial Tr. Day 6, at 10:25–11:15.)

Jablonski reiterates the same arguments in his motion for a new trial: (1) that Group's testimony was relevant and admissible to prove that Schmahl had a habit, scheme or plan, admissible under Rule 406, to violate "one of the twelve statutory standards" set forth in Fla. Stat. § 624.155, and that this evidence was particularly critical because this Court, according to the plaintiff, "adamant[ly] refus[ed] to allow any *other* evidence of general business practice";[2] (2) that Group's testimony was admissible under Rule 404(b) to show motive, plan, knowledge, intent and absence of mistake, giving rise to an inference that, because Schmahl was St. Paul's *de facto* agent, St. Paul had actual or constructive knowledge of Schmahl's practices and reputation.

### *(1) The Evidence Was Not Admissible Under Federal Rule of Evidence 406*

Rule 406 provides in pertinent part that "[e]vidence of the . . . routine practice of an organization . . . is relevant to prove that the conduct of the . . . organization on a particular occasion was in conformity with the . . . routine practice." Fed. R. Evid. 406. While the Eleventh Circuit has not articulated a "precise formula for determining when a practice of an organization is so consistent that it becomes routine or habitual," it has held that " 'adequacy of sampling and uniformity of response' are controlling considerations [in making such a determination]." *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1285

---

[1] In open court, the undersigned referenced Rule 405(b), but from the context it is clear the intended reference was to Rule 404(b). (*See* Doc. No. 355, Trial Tr. Day 6, at 10:16–17.)

[2] Jablonski's contention in that regard is purely gratuitous, as the plaintiff has not established that the Court improperly excluded any other evidence proffered by the plaintiff of St. Paul's general business practice.

(11th Cir. 2008) (quoting *Reyes v. Mo. Pac. R.R.*, 589 F.2d 791, 795 (5th Cir. 1979), and Fed. R. Evid. 406 advisory committee's note).  In other words, "conduct admitted as evidence of habit must reflect a *systematic response to specific situations* to avoid the danger of unfair prejudice that ordinarily accompanies the admission of propensity evidence[.]"  *Id.* (emphasis added).  Thus, the examples proffered to establish habit or pattern must be "numerous enough to base an inference of systematic conduct" and to establish "one's regular response to a repeated specific situation"  before they are admissible to establish a pattern or habit.  *Id.* (quoting *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1533 (11th Cir. 1985).  Based on that standard, the *Goldsmith* court held that the plaintiff's proffered evidence of "only four" other instances of behavior conforming to the alleged conduct in the plaintiff's case was insufficient to establish habit or pattern.  *Id.*

Based on *Goldsmith* and the cases cited therein, this Court concludes that the conduct to which Group would have testified, concerning five encounters with Schmahl in the context of handling three different claims over the course of five years was not admissible to prove habit or routine practice under Rule 406, particularly given that Schmahl and his company have handled over 4000 claims for St. Paul in the course of a career spanning more than twenty years.  The Court did not err in concluding that the proffered testimony was not admissible under Rule 406.

### *(2)  The Evidence Was Not Admissible Under Federal Rule of Evidence 404(b)*

Rule 404 provides, in pertinent part:

**(a)  Character evidence generally.**—Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith. . . .[3]

**(b)  Other Crimes, Wrongs, or Acts.**—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

Fed. R. Evid. 404.

As far as the Court can tell, the plaintiff appears to be arguing that evidence of Schmahl's dealings with Group were not offered to prove Schmahl's character or that he acted in Jablonski's case in

---

[3] The rule also enumerates exceptions that permit the admission of evidence of the character of the accused in a criminal action in certain contexts; the character of an alleged victim in a criminal action in certain contexts; and the character of a witness specifically as pertains to his reputation for truthfulness, as permitted under Rules 607, 608, and 609.  Fed. R. Evid. 404(a)(1), (2) and (3).

conformity with the actions Group's testimony would have described. Rather, the evidence was proffered to establish that St. Paul had knowledge of Schmahl's prior acts and character and therefore should reasonably have expected Schmahl to act in conformity therewith when he was called upon to estimate the damages to Jablonski's boat. In other words, although Rule 404 expressly prohibits "evidence of a person's character offered to prove that the person acted in conformity with the character trait," Fed. R. Evid. 404 advisory committee's note to 2006 Amendments, Jablonski seeks to use the evidence to show that *St. Paul* should have been aware of Schmahl's character and should have expected him to act in conformity therewith when dealing with Jablonski's claim. However, because Group specifically testified that none of the three cases through the course of which he came into contact with Schmahl involved St. Paul, there is no basis for imputing knowledge of Schmahl's conduct in those cases to St. Paul. (*See* Doc. No. 373-3, 10/30/2008 Dep. of G. Group at 13:11–16:1; 29:21–32:5.) Moreover, it appears to the Court that Jablonski essentially seeks to bring through the back door evidence that is clearly not admissible through the front door, and the Court remains persuaded that this evidence is not permitted under either Rule 404 or Rule 406. Even if it were both probative and otherwise admissible, the Court properly exercised its discretion to exclude the evidence under Rule 403 as substantially more prejudicial than probative.

###     E.     Irrelevant "Opinion" Testimony Was Properly Excluded.

Jablonski maintains that a new trial is warranted on the grounds that the Court refused to allow his experts to testify concerning properly disclosed opinions that were well within their expertise. Specifically, the Court refused to permit plaintiff's expert witness Gary Fye to testify as to the industry-accepted meaning of the phrase "manage severity" used in St. Paul's performance evaluations, on the grounds that Fye was not competent to explain the meaning of the phrase as used in the industry. The Court also refused to permit Fye to testify regarding St. Paul's financial statements and wealth, which the plaintiff claimed was relevant to support Fye's opinion concerning "the influence of goal setting on claim handling and that emphasizing lower loss ratio and combined ratio engender wrongful claim practices and how they relate numerically to written and earned premium." (Doc. No. 361, at 14 (quoting Doc. No. 273, Jt. Pretrial Stmt).) In addition, Jablonski's other expert, Stephen Prater, according to the plaintiff, was "poised to explain how pattern and practice could be demonstrated without individual claim files." (Doc.

No. 361, at 14–15.)  Plaintiff asserts, in an entirely conclusory fashion and with basically no argument in support of the assertion, that the Court's exclusion of the experts' proposed testimony was "plain and prejudicial error."  (Doc. No. 361, at 14.)

The Court disagrees.  First, with respect to Fye's testimony, the plaintiff failed to lay a proper foundation to support the witness's competence to testify as to the meaning of the phrase "manage severity" within the insurance industry as a whole.  Further, testimony concerning St. Paul's financial statements and wealth was not particularly relevant and would have been substantially more prejudicial than probative.  Further, because the jury chose not to award punitive damages, any potential error in excluding the financial information did not result in prejudice.

With respect to Prater's testimony, Jablonski has not asserted in his motion what further evidence he would have elicited if the Court had not "cut off" his examination on redirect, or how the plaintiff was prejudiced thereby, nor did he raise a timely objection to the ruling.  Regardless, the transcript of the exchange on redirect clearly demonstrates that the testimony being elicited was unnecessarily cumulative, as the plaintiff had covered the same evidence on direct examination.  Although Jablonski complains that Prater's testimony was "cut off," the jury actually was permitted to hear Prater testify (again) on re-direct to the effect that St. Paul's "pattern and practice [was] reflected in the handling of this case," and to elaborate on that assertion by stating, "We know that over 4300 claims have been handled by Mr. Schmahl for the company, and that he has no guidelines or supervision or oversight.  I know from seeing the performance evaluations from any number of different employees at different levels of the companies that they have had claims payout goals, and the head of the whole company's claim department said nothing changed since the merger."  (Doc. No. 317, Trial Tr. Day 2, at 107:17–108:2.)

In sum, the plaintiff has not established that the Court committed any error with respect to the experts' testimony or, if even if it had, that the Plaintiff was prejudiced thereby.

**F.      Plaintiff Was Not Prejudiced by Introduction of the Offers to Compromise.**

Plaintiff contends the Court's decision to allow two letters written by Jablonski to St. Paul's former legal counsel, David Famulari, was error and warrants a new trial.  Jablonski sent the letters, respectively dated May 17, 2007 and August 29, 2007 (Defense Ex. Nos. 115 and 120), before he filed his bad-faith counterclaim on September 19, 2007 but several months after submitting the Civil Remedy Notice, which

is a prerequisite to filing a bad-faith lawsuit. Plaintiff characterizes these letters as offers of compromise and argues that, as such, they should have been excluded under Rule 408. Jablonski also argues that the letters were irrelevant to the handling of Jablonski's contractual claim.

St. Paul counters that the letters were introduced for the purpose of "indicating Plaintiff's own assessment of the cost of repairs to the boat." (Doc. No. 373, at 14.) St. Paul also maintains the letters show the reasonableness of St. Paul's conduct because they demonstrate that Jablonski was "never satisfied" with the amount proposed to repair the boat, no matter who proposed it, and that his demands were "unreasonable and continually changed." (*Id.*) Finally, the defendant argues that, to the extent the letters can be deemed offers of compromise, the plaintiff opened the door to such evidence by introducing evidence of all settlement offers and meetings that were conducted before these letters were sent, through the testimony of Penny Martlew and Michael Fuller.

The Court finds that the letters sent by Jablonski to St. Paul during the summer of 2007, prior to the filing of the bad-faith lawsuit, were not admitted for the purposes of providing liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach any party as to a prior inconsistent claim, and therefore were not inadmissible under Rule 408. Moreover, the letters were relevant to St. Paul's defense that it did not act in bad faith and to its claim that Jablonski himself was unreasonable and was difficult to deal with. Finally, the letters were clearly not more prejudicial than probative, as is amply substantiated by the fact that the jury found in favor of Jablonski on his bad-faith claim.

G.     **Plaintiff Was Not Prejudiced by Introduction of the Evidence Purportedly Challenging the Amount of the Umpire's Award.**

Jablonski argues that St. Paul, under Florida law, was not have been permitted to dispute the amount awarded by the appraiser after the parties failed to reach an agreement as to the value of Jablonski's claim, given that St. Paul elected not to challenge coverage for Jablonski's claim as a whole, which it conceivably could have done under the terms of the insurance contract. On that basis, Jablonski contends that the Court erred in allowing St. Paul to elicit testimony addressing the question of why it chose not to submit the entire amount of the appraisal award immediately, and in allowing into the record statements from St. Paul's witness, Joe Grenzebach, to the effect that the appraisal award was "exorbitant . . . crazy." (Doc. No. 322, Trial Tr. Day 2, at 84:17–18.) Jablonski asserts that this evidence

was inadmissible both because it was irrelevant, since the validity of the appraisal amount was not in dispute, and because it was "highly prejudicial to Jablonski's presentation of his consequential damages claim because it confused the issue among the jurors who did not understand the binding nature of an appraisal award and left the jury with the misimpression that Jablonski was overpaid on his contract claim," and "plainly impacted the jury's verdict." (Doc. No. 361, at 18.)

St. Paul contends, in response, that the Eleventh Circuit case upon which the plaintiff relies has been disapproved by Florida state courts[4] and that, as a matter of law, even though St. Paul elected not to challenge coverage in whole or in part in this case, it nonetheless retained the right to raise and argue any coverage defense in defending itself against the bad faith claim, including by introducing testimony of its agents regarding their reaction to the appraiser's award.

The Court agrees that St. Paul retained the ability to present evidence of its agents' frame of mind and reasons for their actions, given that the statute required the plaintiff to prove, as part of his bad faith claim, that St. Paul did not attempt "in good faith to settle claims when, *under all the circumstances*, [it] could and should have done so, had it acted fairly and honestly toward its insured." Fla. Stat. § 624.155(1)(b)(1) (emphasis added). St. Paul's reaction to the appraisal award and its reasonable conclusion that parts of the award were in error were relevant to its defenses.

Moreover, even if the evidence were admitted in error, Jablonski has not established that he was actually prejudiced by it. Pursuant to Jablonski's request, the Court instructed the jury that "[t]his is not an

---

[4] At least two Florida district courts of appeals have concluded, either expressly or implicitly, that the Eleventh Circuit's holding in *Three Palms Point, Inc. v. State Farm Fire & Casualty Co.*, 362 F.3d 1317 (11th Cir. 2004), the case upon which the plaintiff relies, misinterpreted the Florida Supreme Court's decision in *State Farm Fire & Casualty Co. v. Licea*, 685 So. 2d 1285 (Fla. 1996). *See Liberty Am. Co. v. Kennedy*, 890 So. 2d 539, 541 (Fla. 2d Dist. Ct. App. 2005) (expressly holding that *Three Palms* misinterpreted *Licea*, and further holding that the submission of the claim to appraisal did not foreclose the insurance company from challenging a specific element of loss as not being covered by the policy in the underlying action); *Fisher v. Certain Interested Underwriters at Lloyds Subscribing to Contract No. 242/99*, 930 So. 2d 756, 759 (Fla. 4th Dist. Ct. App. 2006) (where the insurer had tendered payment to its ensured to cover future additional living expenses and depreciation that were awarded in the appraisal in order to avoid a bad faith claim, but only because it felt constrained to do so under *Three Palms Pointe*, holding that the insurer's payment did not prevent it from subsequently asking the state trial court to rule on the issue of coverage of that element of damages, and that the trial court did not err in finding that portion of the plaintiff's claim was not covered or in ordering the homeowners to return that portion of the funds awarded in the appraisal). *Cf. Sands on the Ocean Condo. Ass'n, Inc. v. QBE Ins. Corp.*, No. 05-14362-CIV, 2009 WL 790120, at *3 (S.D. Fla. March 24, 2009) (likewise noting that 4th District Court of Appeals in *Kennedy* had rejected *Three Palms* as misinterpreting *Licea* and therefore holding, in light of *Kennedy* and in conjunction with the specific language in the appraisal award at issue, that the insurer was entitled to challenge coverage as to portions of the appraisal award).

action to recover damages for breach of an insurance contract itself.  There is no dispute that all monies due under the policy have been paid at this point."  (Doc. No. 344, Jury Instrs. at 9.)  The jury was also instructed as to the nature of the claim it was called upon to decide, and there is simply no indication that the members of the jury were confused as to the task with which they were charged.

In short, Plaintiff is not entitled to a new trial on this basis either.

### H.    The Court's Comments Regarding Gary Fye Did Not Amount to Error Warranting a New Trial.

Jablonski directs the Court to a remark by Fye to the effect that St. Paul "recognized that this was a problem case when the insurance company decided to beat their own policyholder to the courthouse and try to deprive him of a jury."  (Doc. No. 321, Trial Tr. Day 3, at 140:20–23.)  In response, the Court directed the jury to disregard that statement.  Specifically, the Court stated:

> Ladies and Gentlemen of the Jury, you will disregard that, totally disregard that and it will be stricken from the record. . . .
>
> Everybody has a right to come to this Court if they feel that they have a case to bring to this Court.  The insurance company in this case brought a declaratory judgment action which simply asks this Court to determine whether or not they had paid what the policy required them to pay, and the Court held that they had and that then, after that was done, Mr. Jablonski, through his lawyers, filed a bad faith counterclaim.  And that's all we're trying here today is the counterclaim for bad faith.  But there is no inference that you can or should draw from the fact that the insurance company, because they couldn't settle it otherwise, brought a declaratory judgment action and asked the Court to decide, have we paid what we owe?

(*Id.* at 140:24–141:17.)[5]  Jablonski contends that these comments diminished Fye's credibility in the jury's eyes and improperly demonstrated a bias against Fye (and the plaintiff) sufficient to "excite a prejudice [in the jury] which would preclude a fair and dispassionate consideration of the evidence" and that the comments therefore warrant a new trial.  (Doc. No. 361, at 19 (quoting *Wilson v. Bicycle S., Inc.*, 915 F.2d 1503, 1508 (11th Cir. 1990).)

---

[5]  The plaintiff also complains that, at another point during Fye's testimony, the Court commented that Fye was "rambling around in places that we don't need to go for this trial," and therefore suggested to plaintiff's counsel that she ask leading questions in order to get him to the point and move the proceedings along.  (Id. at 20:3–7.)  The Court's observation and suggestion were both warranted, and could not reasonably be considered to have been derogatory, to have detracted from Fye's credibility, or to have prejudiced the jury against him. *See Deary v. City of Gloucester*, 9 F.3d 191, 194 (1st Cir. 1993) ("The trial judge has discretion to maintain the pace of trial, and indeed 'has the responsibility to oversee the conduct of a trial so that it moves expeditiously[.]' " (quoting *Desjardins v. Van Buren Cmty. Hosp.*, 969 F.2d 1280, 1281 (1st Cir. 1992)).

Counsel for the plaintiff failed to object promptly to the Court's instruction. Nonetheless, when the plaintiff later objected, the Court granted his motion to modify that instruction in order to correct any false impression that might have been left with the jury. The modified instruction that the Court provided to the jury was as follows:

> Ladies and Gentlemen of the Jury, during the direct examination of Mr. Jablonski's expert witness, Gary Fye, you may remember that this Court instructed you not to draw any inferences from St. Paul's litigation conduct. Specifically, Mr. Fye testified that, quoting, this case, to me, is a no-brainer and – and I know that the same elements that I'm seeing are recorded right in the claim file. It was recognized that this was a problem when the insurance company decided to beat their own policyholder to the courthouse and tried to deprive him of a jury.

> I then gave the following instruction to you [whereupon the Court reread the instruction to which the plaintiff objects, as set forth above].

> The Court now modifies that instruction. The plaintiff, Mr. Jablonski, takes the position that you should draw an adverse inference against St. Paul based on St. Paul's decision to file suit in admiralty and as a declaratory judgment action, both of which are tried to a judge without a jury. Mr. Jablonski suggests that from those facts, you may infer that St. Paul was trying to avoid a jury trial, trying to beat its policyholder to the courthouse, causing him to incur attorneys fees and otherwise engaging in harassing behavior.

> On the other hand, St. Paul takes the position that it was frustrated by its inability to reach an agreed settlement with Mr. Jablonski and therefore pursued its rights under the policy to demand an appraisal and to ask the court system to determine if it had complied with its obligations under the insurance policy.

> I now instruct you that either one of these is a permissible inference. It is up to you to decide if either of these inferences, or some other inference, is appropriate from all the evidence you have heard in this case. That decision is completely up to you.

(Doc. No. 379, Trial Tr. Day 7, at 3:7–5:3.) Neither party objected to this modified instruction, and any potential harm resulting from the original instruction was remedied by the modification. A new trial on the basis of the original instruction is therefore not warranted.

**I.      The Court's Questioning of Richard DeFreitas Did Not Preclude Fair Consideration of His Testimony by the Jury.**

Jablonski argues that the Court's questioning of the appraiser Rick DeFreitas, who testified both as a fact witness and as one of plaintiff's experts, was improper. As an initial matter, however, the plaintiff does not dispute that federal district judges have inherent power to question witnesses, Fed. R. Evid. 614(b), and in fact have a duty to do so where necessary to clarify testimony. *United States v. Block*, 755 F.2d 770, 775–76 (11th Cir. 1985).

The Court finds that its attempt to clarify confusion engendered by DeFreitas' dual roles and conflicting opinions was warranted, given that, in his role as umpire, DeFreitas did not include replacing the teak decks because he did not think complete replacement was warranted, while in his role as expert, he included the cost of complete replacement of the teak decks in the cost of repairing the *Willpower*. The Court found these conflicting positions to be in need of clarification and that the jury would benefit from such clarification. Moreover, as St. Paul points out, the Court, after attempting to clarify DeFreitas' position, then stated: "Due to the Court's questions, either of you may ask further." (Doc. No. 338, Trial Tr. Day 6, at 140:21–22.) Plaintiff's counsel availed themselves of the opportunity to question DeFreitas further. More critically, counsel did not object to the Court's line of questioning at the time it occurred or within a reasonable time thereafter. To the extent the Court somehow displayed prejudice in the questioning of DeFreitas, the plaintiff forewent his opportunity to object in a timely fashion, as required by Rule 614(c).

If the Court's questioning was in any way "improper," the plaintiff has neither shown that such questioning resulted in prejudice, nor did he preserve his ability to raise an objection thereto.

## III.  CONCLUSION

The Court finds Jablonski's evidentiary objections to be without merit. In many instances, the plaintiff failed to raise an objection contemporaneously with the alleged error or within a reasonable time thereafter. Moreover, to the extent there was error, the plaintiff has not shown that the error resulted in substantial prejudice or substantial injustice. Because the verdict does not appear to have been "substantially swayed," in light of "the number of errors, the closeness of the factual disputes, the prejudicial effect of the evidence, [or] the instructions given," *Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 37 F.3d 1460, 1465 (11th Cir. 1994), there is no legitimate basis for awarding a new trial. *Cf. Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004) (noting that a new trial is warranted where errors caused substantial prejudice to the affected party, affected the party's substantial rights or resulted in substantial injustice).

Accordingly, Jablonski's Motion for a New Trial (Doc. No. 371) is hereby **DENIED**.

It is so **ORDERED**.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge
Sitting by Designation in the
Middle District of Florida